FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

2018 AUG -7 AM 11: 50

U.S. DISTRICT COURT
ERN DISTRICT OF OHIO
CLEVELAND

| | | |
|---|---|---|
| CHRISTOPHER META | ) | |
| | ) | CASE NO. 4:14-cv-0832 |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD V. NUGENT |
| v. | ) | |
| | ) | |
| TARGET CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OBJECTOR ERICH NEUMANN'S**
**REPLY TO PLAINTIFF'S RESPONSE TO OBJECTIONS**

## I.    INTRODUCTION

Class Member Objector Erich Neumann, Esq. ("Objector") hereby submits this reply memorandum in opposition to Plaintiff's Motion for Final Approval of Class Settlement and Response to Objections (ECF No. 176) ("Plaintiff's Motion"). In opposition to Plaintiff's Motion, Objector incorporates (but will not repeat here) his previous arguments in opposition to Plaintiff's Motions for Preliminary Approval and Attorney's Fees (ECF No. 174) ("Neumann Objection"). Here, Objector specifically replies to the arguments in Plaintiff's Motion made with respect to the Neumann Objection. Plaintiff's Motion at 36-41.[1] For all of the reasons provided below, coupled with those provided in the Neumann Objection, the Court should deny Plaintiff's Motion.

---

[1] Page numbers referenced will be those assigned by the Court's ECF system.

## II.   LAW AND ARGUMENT

### A.   The Class Definition Excludes Dual Purchasers, and Plaintiff's Arguments to the Contrary are Completely Irrelevant.

For all of the reasons provided below, the Class Definition can only be interpreted according to its plain language excluding Dual Purchasers. It is therefore deficient and Rule 23's Notice requirements are not met. Plaintiff's arguments to the contrary (Pl. Mot. at 37-38) are largely irrelevant and otherwise unavailing. Notably, "[t]he interpretation of a class definition is a question of law that [U.S. appellate courts] review de novo." *In re Motorola Securities Litig.*, 644 F.3d 511, 516 (7th Cir. 2011).

#### 1.   The plain language of the Class Definition excludes Dual Purchasers.

Though stating in conclusory fashion that Objector "willfully misreads" the Class Definition (Pl. Mot. at 37), it is Plaintiff that willfully avoids analyzing the Class Definition's *plain language* in its brief. *Id.* at 37-38. It is not a "willful misreading" of the phrase "the settlement specifically excludes purchasers of Nice-Pak's 'Sigma' formulation" to mean that the settlement specifically excludes purchasers of Nice-Pak's 'Sigma' formulation. This is not a matter of ambiguity; but rather one of applying the words of the Class Definition in their most obvious literal sense. Despite Plaintiff's suggestions to the contrary, words have meaning. The parties' decision to adopt language that "the settlement specifically excludes purchas*ers* of Nice-Pak's 'Sigma' formulation" (rather than purchas*es*) is material and dooms any settlement that would operate to waive claims by Dual Purchasers.

#### 2.   Extrinsic evidence (such as the claim form) cannot rewrite the plain language of the Class Definition.

Attempting to redirect the Court's attention away from the plain language of the Class Definition, Plaintiff suggests that extrinsic evidence and other extraneous material provided to Class Members (namely, the claim form) operates to trump the Class Definition's plain language.

Pl. Mot. at 37. This argument is legally baseless, as the plain language of the Class Definition and settlement agreement cannot be rewritten based on extrinsic evidence. *See, e.g., In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435, 1442–43 (9th Cir. 1987) (starting with the plain language of the class definition in reviewing a lower court's interpretation of an existing class definition), *vacated on other grounds*, 940 F.2d 1583 (9th Cir.1991); *see also Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96-8414, 2015 WL 5603020, at *3 (S.D.N.Y. Sept. 21, 2015) (rejecting "interpretation of the class definition [that] contradicts the plain reading of the definition").

**3. Alternatively, other 'extrinsic evidence' provided to Class Members underscores the exclusion of Dual Purchasers.**

Alternatively, even if the Court *were* to consider extrinsic evidence (which it should not given the plain language of the Class Definition), the majority of extrinsic information provided to putative Class Members underscores the exclusion of Dual Purchasers from participating in the settlement. Plaintiff cites the claim form, but ignores other materials (which are meant to be reviewed *before* proceeding to the claim form), which (like the Class Definition) reinforces the exclusion of Dual Purchasers.

First, the "Notice of Proposed Class Action Settlement" states that the "Class specifically excludes purchasers of Nice-Pak's 'Sigma' formulation and subsequent product formulations of Up & Up flushable toddler wipes" and that the person receiving notice may be entitled to receive compensation if (among other things) "you are a Class Member[.]" ECF No. 169-2 at 51.

Second, the "Frequently Asked Questions" on the settlement website, answering the question "How do I know if I am a member of the settlement class?", responds in part by stating that "[t]he settlement specifically excludes purchasers of Nice-Pak's "Sigma" formulation and subsequent product formulations of Up & Up Flushable toddler wipes." Settlement Website FAQ,

3

attached hereto as Exhibit "A" at 1. The FAQ foes on to say that settlement funds "may" be available for "eligible" class members. *Id.* at 2.

Obviously, the Notice and FAQ are meant to be read *before* a putative Class Member elects to submit a claim (and hence turn to the Claim Form on which the Plaintiff relies). Plaintiff's reliance on extrinsic materials is misplaced, both legally and factually.

### 4. It is irrelevant that Notice was sent to Dual Purchasers.

Plaintiff also suggests that membership in a Class is confirmed not by the content of the Notice, but by the mere fact that the Notice (despite its content) was received by a putative Class Member. Plaintiff's argument is belied by its own Notice program, whereby "Defendants estimated that the Class consists of approximately 538,710 individuals" but the claims administrator sent "direct notice to approximately 1,192,738 individuals who purchased qualifying products and similar flushable wipes products during the class period." Pl. Mot. at 15-16.

This contention is also without legal merit and flies in the face of Rule 23, which requires notice to "clearly and concisely state in plain, easily understood language...the definition of the class certified[.]" Fed. R. Civ. P. 23(2)(B). Notice must "'fairly apprise the *prospective* members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests." *Intl. Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007) (emphasis added) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975)).

It is the *content* of the Notice—most notably the Class Definition—that must apprise *prospective* class members of, among other issues, their membership in the class. The mere fact that notice is provided is irrelevant. This obvious point is underscored by the Notice itself, which instructs putative class members to "read this notice carefully" as they "*may* be eligible for

benefits" and their rights "*may* be affected by the Settlement." Class Notice, ECF No. 169-2 at 50 (emphasis added). Nothing in the Notice would lead a putative Class Member to believe they were automatically entitled to recover simply because they received Notice.

        **5.**     **Whether Dual Purchasers *who make claims* are actually paid is irrelevant since the Class Definition operates to suppress their claims in the first place.**

As noted above, Plaintiff's silence on the plain language all but concedes that the Class Definition excludes Dual Purchasers. But, Plaintiff pleads, this is excused because those Dual Purchasers who ignore the plain language of the Class Definition, Notice, and "Frequently Asked Questions" and nevertheless proceed to submit an ostensibly excluded claim will be reimbursed.

Plaintiff's reasoning is again irrelevant and ignores the fundamental objective of Rule 23's Notice requirement.[2] Whether or not Dual Purchasers are actually compensated is irrelevant to the question of whether Dual Purchasers can reasonably ascertain their membership in the Class in the first instance. Dual Purchasers who rely on the plain language of the Class Definition and determine they are *not eligible* to participate in the settlement (and submit no claim) receive no benefit. Unbeknownst to them, however, they have forever waived their legal rights.[3]

        **B.**     **In Choosing Between the Lodestar and Percentage of the Fund Methods, the Court Should not Abdicate its Responsibility to Reasonably Determine the Results *Actually Achieved* for the Class.**

Objector is *not*, as Plaintiff claims, "assert[ing] that the Sixth Circuit requires courts to make an attorneys' fee award based on the amount of funds claimed by the class." Pl. Mot. at 38.

---

[2] As noted by one court, "[t]his notice requirement stems from the text of Rule…and more fundamentally, from due process requirements. A cause of action is a property right, and a property right may only be extinguished under a procedure that satisfies due process. *In re: Whirlpool Corp. Front–loading Washer Products Liab. Litig.*, No. 08-65000, 2016 WL 5338012, at *8 (N.D. Ohio Sept. 23, 2016)

[3] Similarly unpersuasive is Plaintiff's argument that the purported claims participation rate of 6.7 percent (Pl. Mot. at 37) somehow excuses the harm done to putative Dual Purchaser Class Members whose claims are released without their knowledge due to their understanding that they are not eligible to participate in the settlement.

Objector agrees that the Court may choose between the lodestar or fund percentage approach, but notes that the Sixth Circuit mandates the decision be based on a detailed analysis of various factors, first and foremost among them the "the results achieved" for the Class. Neumann Obj. at 4-5 (citing *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). Thus, in the rare instances of an uncapped fund settlements, courts must "proceed with care in assessing the value conferred on class members." Fed. R. Civ. P. 23 Adv. Cmte. Notes, Subdivision (h).

Plaintiff cites two and only two cases for the proposition that "courts in the Sixth Circuit typically utilize the lodestar method in claims made settlements." Pl. Mot. at 38, citing ECF No. 176 at 4-6. But in both cases, the district courts carefully examined, considered and relied upon the *actual amount paid to Class Members* in determining: (a) whether to adopt the lodestar or percentage fund method; and (b) how to measure the "results achieved" (actual payments to Class versus total available benefit). *See In re: Whirlpool Corp. Front–loading Washer Products Liab. Litig.*, No. 08-65000, 2016 WL 5338012, at *5-6 (N.D. Ohio Sept. 23, 2016) (determining actual payment to be between $14.5 and $16 million);[4] *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 275-76 (6th Cir. 2016) (noting district court determined *actual class payment* to be $1,593,240, and "split the difference" between that and the total "available benefit" to the Class).

Here, the Court does not have this information, and is thus not equipped to undertake the analysis done by the *Whirlpool* and *Gascho* courts. Unlike *Whirlpool* and *Gascho*, Plaintiff here

---

[4] At the time of the fairness hearing, 202,000 persons claimed a $50 payment, 29,000 persons claimed a 20% rebate worth between $127 and $170, and 12,000 persons claimed a 5% rebate worth between $64 and $85. The Settlement Administrator predicted that the number of claimants to grow another 17.6 percent, and thus the total settlement value estimated to be paid to the Class between was between $17 and $18.8 million. The Court awarded $6.7 million in attorney's fees. Thus, after deduction for costs, class counsel's fee award amounted to 26-28 percent of the funds expended by defendants (the rest going to the class).

It must also be noted that in *Whirlpool*, class counsel was awarded only 20 percent of their actual lodestar. *Id.* at *22.

has been coy with its "estimates" (which have varied wildly due to outrageous assumptions and allegations of widespread fraud in the claims process). While Plaintiff refers to "36,237 presumptively valid claims" with respect to the number of Class Members, it does not provide information as to the total *amount* claimed by those "presumptively valid" claims, though this information could easily (and likely instantly) be provided by the claims administrator.

The Court should decline Plaintiff's invitation that this Court to skip the detailed analysis undertaken by both the *Whirlpool* and *Gascho* courts, which is required under the Sixth Circuit's *Rawlings* decision. The Court should consider the actual amounts paid to Class Members, which it is unable to do at this time.

C.   **Alternatively, in Assessing the Benefit Conferred to the Class, the Court Should not Adopt the 'Available Benefit' Approach Utilized by the District Court in *Gascho*.**

Alternatively, even if the Court were to determine that it did have sufficient information (which it does not) to (a) decide between the lodestar and fund percentage methods and (b) decide how to measure the benefit conferred to the Class, it should not (with respect to the latter) use the 'available benefit' yardstick utilized by the district court is *Gascho*. Not only is that method less equitable than a 'total amount paid' cross-check, there are unique circumstances here distinguishing this case from *Gascho* – factors raised directly by the Sixth Circuit.

1.   **The Sixth Circuit did not specifically adopt the 'available benefit' standard.**

As an initial matter, it must be emphasized that the Sixth Circuit in *Gascho* did not adopt the 'available benefit' standard (as a denominator for a percentage of the fund cross-check), but rather held that it was within the district court's discretion to use that standard. *Gascho*, 822 F.3d at 278. "Because a settlement addresses the particular facts of and parties in a case, calculation of the denominator is necessarily case specific." *Id.* at 282. Indeed, with respect to the district court's

methodology (which Plaintiff asks this Court to adopt), the Sixth Circuit noted that "[a]s a general matter, this procedure presents concerns and we do not endorse a rule adopting a 'midpoint' calculation." *Id.* at 288.

The Court should not, in its discretion, adopt the 'available benefit' denominator. It is inherently less equitable when compared to a 'funds actually paid' approach.[5] Further, as noted below, the facts surrounding the settlement in *Gascho* are distinguishable from those here, rendering the 'available benefit' method inappropriate.

> **2.** **Unlike *Gascho*, which involved a contractual dispute with records identifying all Class Members, the Class size here cannot be determined with accuracy.**

*Gascho* involved a dispute over membership contracts, and thus the parties could determine the Class size with pinpoint accuracy.[6] This in turn allowed for a precise valuation as to the 'available benefit' to the Class.

This is not the case here. While Target "estimates" the Class size to be 538,710, it has no way of knowing this with any certainty. Indeed, Plaintiff claims that one factor Target used in estimating the Class size was "Plaintiff's testimony regarding purchasing patterns[.]" Pl. Mot. at 15. There is no basis to assume that the Plaintiff's purchasing patterns were identical (or even substantially similar) to all putative Class Members. Further, while some customers may enter a rewards number, or purchase products online, others may pay in cash or credit card.[7] Indeed, Target has not provided any detailed basis for its class size estimate. Since only twenty purchases

---

[5] Objector respectfully refers the Court to Judge Clay's dissent in *Gascho*, 822 F.3d at 294-304.

[6] *See generally, Gascho v. Glob. Fitness Holdings, LLC*, No. 11-436, 2014 WL 1350509 (S.D. Ohio Apr. 4, 2014) (report and recommendation).

[7] Merchants cannot legally retain personally identifiable information pursuant to a credit card transaction.

8

may be compensated under the settlement without proof-of-purchase, the Class size is of paramount importance here in determining the 'available benefit' to the Class.[8]

Allowing the parties to 'guesstimate' class size as a way of measuring the 'total available benefit' to the Class presents an incredible risk for collusion. Courts cannot permit attorneys' fees to be based on a Class size number that is arbitrarily selected by the parties. As noted in *Gascho*, where such concerns were *not at issue*, "[a] case-by-case approach allows a reviewing court to address the varying danger of tacit collusion between the parties[.]" *Id.* at 284.

There is data here indicating that the Class Size may be grossly exaggerated. Plaintiff brags about the 0.00037 percent opt-our rate as being far lower than that seen in other class actions. Pl. Mot. at 27. Indeed, empirical studies have found consumer class action opt-out rates to average 0.2 percent.[9] Frankly, there is nothing so remarkable about a $1.35 gift card settlement that one would expect opt-outs to occur at $^1/_{540}$ (1/540th) the rate than is typically seen in consumer class actions. The *far more likely* scenario is that the Class size is either grossly inflated, or the notice program failed to reach a significantly large number of Class Members (or Dual Purchasers thought they were excluded). Either instance weighs heavily against adoption of the 'available benefit' yardstick.

3.     **The 'available benefit' cannot be determined since Dual Purchasers are excluded from the Class; or, alternatively, would be confused as to their class membership status.**

It is axiomatic that the value of the settlement to either non-Class Members or putative Class Members who are led to believe they are *not* in the Class (due to sloppy Class Definition

---

[8] Even Plaintiff acknowledges that it is highly unlikely that any Class Members will have itemized receipts for more than 20 purchases spanning back years.

[9] T. Eisenberg & G. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1549 (2004), avail. at https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=1362&context=facpub.

9

drafting) is zero. Therefore, even if the Court were to rely on the number of units sold instead of Class size (which it should not, given the proof-of-purchase requirement), the 'available benefit' cannot be determined because a number of those units would be tied to Dual Purchasers who are excluded (or reasonably believe themselves to be excluded) from the Class.[10]

In holding the district court did not abuse its discretion, the Sixth Circuit specifically noted that the 'available benefit' methodology would likely be inappropriate in cases where the claims process presents "information in a confusing way." *Id.* at 287-88. This would naturally extend to a poorly drafted Class Definition that would lead reasonable Class Members to believe they were excluded from the Class.[11]

Thus, while the Sixth Circuit noted that Class Member confusion was not an issue in the *Gascho* case (*id.* at 288), the same cannot be said here. Even if Dual Purchasers are included in the Class (which they are not), many Dual Purchasers reviewing the notice many nevertheless interpret "the settlement specifically excludes purchasers of Nice-Pak's 'Sigma' formulation" as excluding them from the settlement. At the very least, there is a real *risk* of confusion given the plain language of the Class Definition. This case is therefore distinguishable from *Gascho*, and the 'available benefit' method is inappropriate.

4.     **Unlike here, direct notice in *Gascho* was achieved for over ninety percent of Class Members.**

One factor the Sixth Circuit noted in approving the district court's methodology was the fact that over ninety percent of the Class Members in *Gascho* received direct mail notice (by postcard). *Id.* at 289. Here, there is no indication as to the extent by which direct notice to Class

---

[10] This is also supported by the suspicious and highly unusual low opt-out rates described above.

[11] Further, as explained below, the 80 percent claim rejection rate is evidence that the claims process is flawed in many respects, including possible confusion.

Members was actually achieved. Plaintiff states that 1.1 million emails were sent to "individuals purchasing qualifying products and similar flushable wipes products", but is coy about the actual number of Class Members who purchased the products that Target can say with certainty were included in that email blast (elsewhere, Plaintiff suggests that direct notice was achieved for 280,000 Class Members, far less than the estimated 538,710 Class size).[12] Thus, insofar as the success of a direct notice program is a factor supporting the *Gascho* 'available benefit' methodology, the facts here weigh against its adoption.

5.      **Unlike in *Gascho*, there is a proof-of-purchase requirement in this case.**

Another important distinguishing characteristic between this settlement and the one at issue in *Gascho* is the proof-of-purchase requirement. According to the Sixth Circuit, "[a]lthough we decline to adopt a categorical rule [against 'available benefit' valuations], we recognize the validity of the dissent's concern about settlement structures that are contrived to discourage claims." *Id.* at 287. One such example, the Court noted, is where a settlement requires claimants to have receipts or other proofs-of-purchase. *Id.* (citing *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013)). This is yet another factor cited by the *Gascho* Court that weighs against adoption of the 'available benefit' methodology in this case.

6.      **The eighty percent claim rejection rate in this case weighs against adoption of the 'available benefit' yardstick.**

The staggering rejection rate—*nearly eighty (80) percent*—of claims made in this case thus far raises concerns which should prompt the Court to avoid the 'available benefit' measure of

---

[12] Finnegan Decl., ECF No. 169-4 at ¶ 15.

settlement value.[13] This is yet another distinction from *Gascho*, where only four (4) percent of claims were denied.[14]

While there is no evidence that these claims were improperly denied, it is nevertheless important in a settlement exhibiting such high rates of claim denials that Class Counsel has an interest in aggressively monitoring the claims process to ensure that all valid claims are paid. But here, the attorney fee calculation proposed by Plaintiff provides no incentive for Class Counsel to represent the interest of potential claimants with denied claims; and, predictably, Class Counsel has done nothing to investigate whether the eighty percent rejection rate is warranted. One wonders if Class Counsel would be similarly indifferent if every denied claim meant less attorney's fees.

This underscores another important distinction between this case and *Gascho*. In *Gascho*, the names of every class member were known to the parties and claim administrator. Thus, putative class members needed only to prove their identity to participate in the settlement – a low threshold which gave little discretion to the claims administrator to deny claims. Here, by contrast, the claims administrator is given much wider latitude to deny claims, since the specific identities of Class Members are not known. Thus the potential for 'moral hazard' associated with claims process gamesmanship plays a far larger role in this case than it did it *Gascho*.

7.      **Unlike *Gascho*, the settlement website in this case omitted key information.**

The Sixth Circuit specifically noted that the 'available benefit' method would be inappropriate in instances where there are "websites that appear designed to confuse class

---

[13] Of the 170,542 filed claims, the claims administrator flagged 134,305 claims as not valid. Prutsman Decl., ECF No. 176-2, at ¶ 9. Further, Plaintiff notes that of the remaining 20 percent of claims, they are still "subject to validation", implying that yet another round of claim rejections may be on the horizon. Pl. Mot. at 27.

[14] *Gascho v. Global Fitness Holdings, LLC*, No. 11-426 (S.D. Ohio Jan. 23, 2014) (Decl. of Jeffrey Dahl, ECF No. 126-1, at ¶¶ 32-33) (2,175 claims rejected out of 51,618 total claims)

members, either by omitting information on the claims process or by presenting this information in a confusing way." *Gascho*, 822 F.3d at 287-88. As explained in greater detail below, this is precisely what happened in this case, distinguishing this case from *Gascho* and further rendering the 'available benefit' method inappropriate.

### D.    Plaintiff Still Refuses to Disclose the Amount of Money that will Currently be Paid to Class Members.

Tellingly, though the information could be instantly provided by the settlement administrator, Plaintiff withholds the actual amount of funds expected to be paid based on the current number of 'presumptively valid' claims. Plaintiff is intentionally ambiguous as to whether the "36,237 presumptively valid claims" refers to number of Class Members making claims, or the number of units for which compensation is sought. Though the undersigned raised this issue in his original objection, Class Counsel opted not to clarify. Neumann Obj. at 7 (fn. 8). Insofar as the 36,237 number refers to the number of Class Members making claims, Plaintiff has not provided the number of total units for which compensation is sought.

Plaintiff's reluctance to provide this information is illuminating. Even assuming all of the 'presumptively valid' claims are ultimately deemed valid, the financial value to the Class may be $48,9191 (if "claims" refers to the number of units), or approximately $503,875 (if "claims" refers to the number of Class Members). [15] These numbers are dwarfed by the amount of attorneys' fees sought in this case ($1,361,890), which the Court should at least take into consideration when deciding on how Class Counsel is to be compensated.

---

[15]These calculations utilize the $1.35 gift card as the measure of compensation for each unit purchased. With respect to the estimated number of units per class member (10.3), this number is arrived at by dividing Defendant's estimate of the number of wipes sold during the Class Period by Defendant's estimate of the number of Class Members.

13

In any event, the Court has a right (if not an obligation) to analyze the actual payments expected, no matter what measure of fees it ultimately decides upon. Plaintiff's reluctance to be more forthcoming with the Court—with information that was provided and analyzed by both the *Whirlpool* and *Gascho* courts—should make the Court very wary of Plaintiff's proposed fee structure.

### E.  Plaintiff does not Dispute the Settlement Website's Deficiencies, which are Particularly Material in 'Available Benefit' Cases.

Plaintiff does not dispute the deficiencies in the settlement website highlighted in Objector's July 3rd objection. Plaintiff also admits that it waited weeks to update inaccurate information on the website, and further failed to comply with this Court's April 4, 2018 Preliminary Approval Order.

Plaintiff characterizes its failure to provide the objection deadline on the website as a "typographical error." But the difference between "deadline for requesting exclusion" and "deadline for requesting objection" is hardly a 'typo'. The result of this 'error' was that the Settlement landing page—*for the entirety of the notice period except for the final week before the objecting deadline*[16]—failed to say *anything* regarding a Class Member's ability to object, much less a deadline for doing so. This "mistake" is even more indefensible in that Plaintiff admits that it was aware of the error as of May 15, 2018 but waited weeks to correct it. Pl. Mot. at 39

With respect to the failure to post the fee application to the website, this Court's Preliminary Approval Order "direct[ed] the dissemination of notice in the form and manner set forth in the settlement agreement[.]" Apr. 4, 2018 Order, ECF No. 170, at 1. The proposed notice

---

[16] Plaintiff states that the "typographical error" was "corrected no later than July 2." Pl. Mot. at 39. But the printout provided by Objector to the Court which was printed on July 1st or 2nd (ECF No. 174-1) shows that it was still not corrected as of that date. It therefore seems likely that the actual date the mistake was corrected was July 2nd, when the Fee Application was apparently added to the website.

documents attached to the settlement agreement obligated the parties to post "the motion for the fees, costs, and expenses...on the settlement website after they are filed." ECF No. 169-2 at 48. Yet the parties did not update the settlement website until ten days after the filing, a mere week before objections were due.[17]

These are hardly "minor technical errors" as Plaintiff describes them. Pl. Mot. at 41. The website landing page in many instances is the first and most important communication to Class Members regarding the settlement.[18] Further, errors such as these take on a greater import in instances where class counsel seek an 'available benefit' valuation to calculate attorney's fees. *See Gascho*, 822 F.3d at 287-88.

## III. CONCLUSION

For all of the aforementioned reasons, the Court should deny Plaintiff's Motion in its entirety.

DATE: August 2, 2018

Respectfully,

Erich Neumann
Attorney and Objector / Class Member
Erich B. Neumann, P.L.
407 Lincoln Road, Suite 2C
Miami Beach, FL 33139
Phone: 305.735.2404
FAX: 305.735.2651
ebn@ebnlaw.com

---

[17] Although Objector claimed that the Fee Application was not available on the website as of July 3rd, it appears the website was updated the evening before the objection was mailed. In any event, it was not updated until July 2nd.

[18] *See* Finnegan Decl., ECF No. 176-1 at ¶¶ 27-28.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was mailed to the following on August 2, 2018:

Clerk of Courts
Carl B. Stokes U.S. Courthouse
801 West Superior Avenue
Cleveland, Ohio 44113

Stuart E. Scott
Spangenberg, Shibley & Liber LLP
1001 Lakeside Avenue East,
Suite 1700
Cleveland, Ohio 44114

Karl A. Bekeny
Tucker Ellis LLP
950 Main Avenue,
Suite 1100
Cleveland, Ohio 44113